## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## NORTHERN DIVISION AT KNOXVILLE

| | | |
|---|---|---|
| DR. LISA ECCLES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:21-cv-382 |
| | ) | |
| WALTERS STATE COMMUNITY | ) | (Jury Demand) |
| COLLEGE and TENNESSEE | ) | |
| BOARD OF REGENTS, | ) | |
| | ) | |
| Defendants. | ) | |

---

## COMPLAINT

---

## I.  NATURE OF THE CASE

1.  Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.*, prohibits discrimination in employment on the basis of sex. Likewise, the Equal Pay Act of 1963, 29 U.S.C § 206(d)(1) prohibits employers from discriminating against an employee on the basis of sex by paying lower wages than are paid to employees of the opposite sex for performing equal work. Dr. Lisa Eccles brings this lawsuit against her joint employers, Walters State Community College and the Tennessee Board of Regents, for violating Title VII and the Equal Pay Act ["EPA"] by paying her less than her male coworkers for the same work and passing over her for promotion because of her sex. When Dr. Eccles complained to her employers about the sex-based discrimination, they subjected her to retaliation in violation of both statutes. Through this lawsuit, Dr. Eccles seeks redress for the harm and losses she sustained due to these violations of her rights.

## II. JURISDICTION AND VENUE

2.      This Court has jurisdiction pursuant to 28 U.S.C. §1331, because this case involves federal questions brought under laws of the United States, namely Title VII and the EPA.

3.      Venue in the Eastern District of Tennessee, Northern Division at Knoxville, is appropriate pursuant to 28 U.S.C. § 1391(b) because the defendants maintain and operate traditional primary campuses and on-line programs and do business within this district. Many of the acts or omissions that form the basis of this complaint occurred in the Eastern District of Tennessee. Venue is appropriate under Title VII's exclusive venue provision, U.S.C. § 2000e–5(f)(3), because the unlawful employment practices were committed in Tennessee; employment records relevant to such practices are maintained or administered in this district; the defendants employed Dr. Eccles in this district; and WSCC has its principal office in this district.

## III. PARTIES

4.      Plaintiff Dr. Lisa Eccles ["Plaintiff Eccles" or "Dr. Eccles"] is a resident of Jefferson County, Tennessee. Dr. Eccles is currently employed by the defendants and has been employed by them since 2006.

5.      Defendant Tennessee Board of Regents ["TBR"] is a state agency and the governing body of the State University and Community College System of Tennessee, including defendant Walters State Community College ["WSCC"]. Defendant TBR's principal office is located at 1 Bridgestone Park, Nashville TN 37214.  It can be served with process by mailing a copy of the summons and complaint to Tennessee Attorney General and Reporter Herbert H. Slatery, P.O. Box 20207 Nashville, TN 37202-0207, or by email to tnattygen@ag.tn.gov in compliance with published Covid-19 protocols.

6.     Defendant WSCC is a state-operated educational institution that receives federal funding.  During events giving rise to this lawsuit, WSCC employed over five hundred (500) employees who are governed by defendant Tennessee Board of Regents. Defendant WSCC's principal office is located at 500 South Davy Crockett Parkway Morristown, TN 37813-6899.

7.     Defendant TBR sets policies and guidelines to govern the institutions of higher learning within its system. TBR receives federal funding, operates defendant WSCC, and implements policies affecting the terms, conditions, and privileges of employment for WSCC employees, including Plaintiff Eccles.

8.     Defendants TBR and WSCC function as joint employers of Plaintiff Eccles who currently works at WSCC's main campus in Morristown. TBR is plaintiff's joint employer because it is a party to plaintiff's contract for employment at WSCC and based upon its actions, omissions, and assumption of responsibilities that Title VII and the EPA impose upon employers. TBR is responsible for, and exercised control over, terms and conditions of Dr. Eccles's employment, including compensation, promotion decisions, and investigations into Dr. Eccles's complaints about sex discrimination and retaliation during her employment with the defendants.

## IV. CONDITIONS PRECEDENT

9.     In addition to complaining about discrimination and retaliation to the defendants, on October 22, 2020, Dr. Eccles timely and dually filed charges of sex discrimination and retaliation with the Equal Employment Opportunity Commission ["EEOC"] and Tennessee Human Rights Commission ["THRC"] alleging that the defendants engaged in unlawful employment practices in violation of Title VII and the EPA. The EEOC issued a Dismissal and Notice of Rights letter dated August 11, 2021.

3

10.     This Complaint is timely filed in this Court after exhaustion of the EEOC/THRC administrative process and within ninety days from the date Dr. Eccles received the notice of her right to file a lawsuit in federal court. All administrative conditions precedent to filing this action have been met.

## V. STATEMENT OF FACTS

11.     Plaintiff Lisa A. Eccles is currently a tenured Professor of Biology at Walters State Community College. Dr. Eccles obtained a Bachelor of Science degree in Biology from Christopher Newport University in 1992, a Master of Science degree in Clinical Laboratory Science from Virginia Commonwealth University School of Medicine in 1994, and a Doctor of Philosophy degree in Biomedical Science from Eastern Virginia Medical School and Old Dominion University in 1997.

12.     In 2006, Dr. Eccles left a tenure-track position at Carson-Newman College and became employed by defendants at WSCC in its Biology Department, Natural Science Division. When the events giving rise to this lawsuit occurred, Dr. Eccles had the fourth longest tenure among the 17 faculty members in the Biology Department.

13.     Dr. Eccles was awarded tenure in 2015 and promoted to full Professor in 2016. In the 2020-2021 academic year, there were eight full Professors in the Natural Science Division, only two of whom were female. Even though Dr. Eccles had the third longest tenure as a full Professor and had been employed by WSCC longer than any other full Professor except for two others, Dr. Eccles was the lowest paid full Professor within the Natural Science Division. After the retirement of two full professors in May 2021, Dr. Eccles is now the lowest paid, yet longest serving as a full Professor in the Natural Science Division.

14.     For many years preceding the filing of her EEOC Charge, Dr. Eccles was paid less

than similarly situated male professors without a legitimate, non-gender-based reason for this compensation disparity.

15. Likewise, and as context for her current claims, Dr. Eccles had previously been subjected to sex discrimination during her tenure process and again when she sought promotion to full professor, although she ultimately secured tenure and promotion.

16. Specifically, in 2015, the Dean of the Natural Science Division, Dr. Jeff Horner, instructed Dr. Eccles that she would not be allowed to pursue tenure and promotion within the same year, and that she must wait a year after securing tenure before she would be allowed to seek promotion to full Professor. Dr. Eccles learned that no such rule existed for male faculty when she later observed her male colleagues pursue and obtain tenure and promotion within the same year.

17. Dean Horner also attempted to derail Dr. Eccles's tenure process by advising her to withdraw her application the day before her tenure vote was to occur because, according to him, her colleagues were going to vote against tenure, which would result in the loss of her job. When Dr. Eccles confirmed that Dean Horner would not be voting, she moved forward with the process. The next day, her colleagues voted unanimously to award tenure to her.

18. In 2015, when Dr. Eccles sought promotion to full Professor, she submitted her Promotion Review Portfolio in a binder to Dean Jeff Horner as is required per policy. Shortly before the scheduled interview date, the Faculty Promotion Committee Chair contacted Dr. Eccles to inform her that important information was missing from her portfolio. The missing documents would have prevented Dr. Eccles from receiving the promotion. Because Dr. Eccles had maintained a full copy of her binder, she was able to resubmit the material that had been removed and was awarded promotion to full Professor.

19. After her promotion, Dr. Eccles received a 1.98% salary increase compared to the

5

typical 7% minimum pay increase awarded to similarly situated male faculty who achieve promotion to full Professor.

20.     Dr. Eccles was only the third female in almost fifty years to achieve promotion to full Professor in the Natural Science Division at WSCC. There are only 11 female full professors out of 165 total WSCC faculty members, and most of those female full Professors are in nursing, a traditionally female field. All eight WSCC Divisions, except Health Programs (nursing), are led by male Deans. The Natural Science Division has never been led by a female Dean since it was established in 1970.

21.     In 2015 and 2016, Dr. Eccles lodged complaints with WSCC human resources about the gender discrimination she experienced when seeking tenure and promotion, but no investigation was ever conducted. In 2017, and again on several occasions in 2019 and 2020, Dr. Eccles reported gender-based disparate treatment and unequal compensation to WSCC management. To date, the defendants continue to pay lower wages to Dr. Eccles than to male Natural Science Division faculty who perform the same work.

22.     On March 9, 2019, Dean Horner began working at Motlow State Community College. In accordance with the personnel policies of defendant TBR, this change by Jeff Horner was required to be discussed with the President of WSCC, Dr. Anthony Miksa, in advance of the change, meaning that Dr. Miksa was aware of the need to hire a replacement Dean for the Natural Science Division before March 9, 2019. TBR approved this appointment.

23.     Despite Dr. Miksa's knowledge that the defendants needed to hire a new Dean for WSCC's Natural Science Division, he and Dean Horner strategically held off notifying division faculty of Horner's departure until after the end of the academic year. Natural Science Divisional faculty are 9-month academic year employees of TBR and WSCC as established by contracts

6

spanning from August 6, 2018, until May 4, 2019. Dr. Miksa and Dean Horner delayed notifying the faculty because they favored a male candidate for the position, a junior level, untenured faculty member with less than ten years of experience named Dr. Matthew Smith. Dr. Miksa wanted to install Dr. Smith into the position of Interim Dean so that Dr. Smith could obtain experience and have an advantage when the hiring process for a permanent Dean took place. The delay until after the end of the academic year meant that divisional faculty would not be under their academic year contract, away from campus, and less available to participate in a meaningful way in any process to install an Interim Dean, making it easier for Dr. Miksa to accomplish his goal.

24.     The Southern Association of Colleges and Schools Commission on Colleges [SACSCOC], the accrediting body of degree-granting higher education institutions in the south, including WSCC, mandates faculty input and shared governance of institutions. Purposefully holding academic governance meetings outside of the 9-month academic year faculty contracts, directly opposes the SACSCOC shared governance mandate.

25.     The most senior tenured faculty member in the Natural Science Division as of May 2019 was Dr. Laurence Fleming. Dr. Fleming had previously served as the Dean of the Natural Science Division. On May 9, 2019, when Dr. Fleming learned of Horner's departure, he wrote President Miksa, Vice President John LaPrise, and Vice President Angela Smith to request that he be named the Interim Dean until a permanent Dean could be hired. Dr. Fleming received no response to his request.

26.     Dr. Fleming was not interested in competing for the Dean position but wanted to act as Interim Dean to facilitate a fair selection process for candidates vying for the Dean's position. It was common knowledge that in almost every past scenario, the President's selection of an Interim Dean was used as a backdoor method to pass over better qualified candidates and

7

secure his favored candidate's promotion to Dean.

27.     In violation of SACSCOC shared governance mandate, a faculty meeting was scheduled for May 13, 2019, to address the Natural Science Divisional Leadership selection process. As of that date, most of the Division faculty were not teaching and several were unable to attend at all. Others had to attend online, but the online participants could not hear anyone other than a single person, nor could they speak in the discussion. The online participants were only able to type comments that may or may not have been seen by the persons participating in person. Some online participants objected to a vote and requested a discussion of viable candidates and their credentials, but those requests were ignored.

28.     Shortly before the May 13, 2019, meeting, in a very unusual and unprecedented move, Dr. Miksa called Dr. Eccles on her personal cell phone and asked her if she was interested in the Interim Dean position. Dr. Eccles told Dr. Miksa that she was interested, and Dr. Miksa responded in a gruff, negative way to her expression of interest. He made it clear to Dr. Eccles that he was not in favor of her becoming Interim Dean, even though she was a tenured full professor with over twenty years of experience. Instead, Dr. Miksa favored a lesser qualified male candidate, Dr. Matthew Smith.

29.     On May 14, 2019, Executive Aide to the Dean Sherry Woody sent the Division faculty an email containing a link to a Google Survey form, purportedly for the faculty to vote for Divisional Leadership. Faculty were to rank their top 4 choices, but there was no information provided about how the rankings would be used to determine a "winner." Some faculty were suspicious of using this Google Survey because their vote was not confidential, subjecting them to risk of retaliation, and because there was no way for them to verify the results. Also, there was a history of using such surveys at WSCC to falsify results. Moreover, Miksa's favored male

8

candidate, Matthew Smith, and his supporters were involved in conducting the survey. President Miksa and Vice President of Academic Affairs John LaPrise were notified of the multiple problems concerning this method and were asked to intervene before voting occurred, yet they did not respond.

30.     Within minutes of the survey closing, Sherry Woody sent out an email announcing that there had been a "majority vote" for Matthew Smith. The numerical results of the survey were not disclosed.

31.     On May 15, 2019, Miksa held another faculty meeting, again against SACSCOC shared faculty governance mandates as they were not under academic year contracts. In this meeting, Miksa did not ask for a showing of who was interested in being Interim Dean, and instead he simply asked if anyone had "concerns." Shortly thereafter, Miksa announced, vaguely, that Matthew Smith would be the Interim Dean.

32.     Dr. Eccles remained after the meeting to seek clarification and to lodge various objections directly with President Miksa about the unfair method that was used to select Smith as Interim Dean. She confronted Dr. Miksa about a previous, and false, assertion he had made to her that no selection decision would be made at that meeting, and she questioned him as to why Dr. Fleming's name was removed from consideration. She specifically asked Dr. Miksa to consider her for the Interim Dean position because she had previously told him that she wanted to be considered. Dr. Miksa agreed, at least momentarily, that he would consider her.

33.     When she left the meeting with Dr. Miksa, Dr. Eccles immediately sent an email message to him and other administrators, including Vice President of Academic Affairs John LaPrise, to confirm that Dr. Miksa had agreed to consider her for the Interim Dean position.

34.     Upon receiving her message, Dr. Miksa immediately summoned Dr. Eccles back

to his private office. Even though he had just told her that he would consider her for the position less than thirty minutes earlier, he now told her that he changed his mind and would not consider her for Interim Dean because it would not be "fair" to Dr. Smith who he referred to as the candidate "nominated" by the Division. Dr. Miksa also told Dr. Eccles in an intimidating and very demeaning tone that she was not "leadership material" and that he was experienced at recognizing good leaders and that she was not one of them because she had not spoken loudly enough in the meeting.

35.     As Dr. Eccles continued to articulate specific objections to Dr. Miksa about the unfair process, he continued to try to discourage and intimidate her from seeking consideration. Finally, he told her that the only way he would even consider her for the Interim Dean position was if she emailed the entire division in a group message about her interest in being considered and obtained a response from all of them, presumably including Smith, documenting 100% support and agreement that she should be considered for the position. Dr. Miksa then abruptly cut off the discussion and walked out.

36.     Thus, while Dr. Smith had to do little if anything during the Interim Dean selection process before being selected, Dr. Miksa discouraged and intimidated Dr. Eccles from pursuing the position and subjected her to unreasonable demands and obstacles before he would even agree to consider her for the position. He did this despite that she had expressed her interest in the position on multiple occasions, and even though he had previously said he would consider her without her obtaining unanimous prior support from the entire division. Dr. Miksa's intimidating, demeaning, and disparate treatment toward Dr. Eccles demonstrates his bias against her because of her gender.

37.     Dr. Eccles was upset and confused by the events of May 15 and followed up the next day with an email message to Dr. Miksa and other Administrators seeking to clarify the

conditions for her to be considered for the Interim Dean position. Dr. Miksa responded to Dr. Eccles's email by refusing to clarify his requirements in writing and demanding that she come back to campus to meet with him in private again. Dr. Eccles replied that she was unable to meet with him but wanted clarification in writing of what she needed to do to be considered. He repeated that he was not comfortable clarifying by email and instructed her to return to campus to meet with him personally, even though her 9-month academic year contract had ended on May 4, 2019, and he knew that she was out of town. Dr. Miksa's actions were designed to intimidate her and prevent there being a record of anything he said to Dr. Eccles about the discriminatory selection process.

38.     On May 28, 2019, Matthew Smith was offered the Interim Dean position in a meeting with Vice President of Academic Affairs John LaPrise. The next day, May 29, Smith announced to the division by email that LaPrise had offered him the position. On May 30, Dr. LaPrise sent an email to the division falsely claiming that he was still in the process of making the selection decision, apparently not knowing that Smith had already announced his selection. Dr. Eccles responded to Dr. LaPrise's message by pointing out the truth that Smith had already announced his selection. As usual, Dr. LaPrise did not respond to Dr. Eccles's message.

39.     Even though Dr. Smith moved into the Dean's office by June 3, Dr. LaPrise did not make a formal announcement confirming Smith's appointment as Interim Dean of the Natural Science Division until June 5, 2019. His formal announcement disingenuously asserts that he, Dr. Miksa, and Dr. Seagle (incoming Vice President of Academic Affairs) considered all faculty for the position. Not only did Dr. Smith's announcement make no mention of Dr. Seagle's involvement in the decision, but both Dr. Miksa and Human Resources Director Jarvis Jennings confirmed to Dr. Eccles that she was not considered for the position.

40.     Dr. Miksa and WSCC Administrators working on his behalf took actions to install

Dr. Miksa's preferred male candidate as Interim Dean to give Dr. Smith an advantage toward securing the permanent Dean position over the better qualified female candidate, Dr. Eccles. Dr. Miksa and WSCC Administrators sought to manipulate the selection process to disguise discrimination against Dr. Eccles with as little resistance as possible from her by: improperly delaying the selection "process" until the academic year was over; intentionally leaving the process vague, undefined, and unstructured; discouraging Dr. Eccles from pursuing promotion; abruptly rushing to appoint Dr. Smith as Interim Dean; making misrepresentations to Dr. Eccles about the selection process; and refusing to consider Dr. Eccles despite her superior qualifications and repeated requests to be considered for the position. Dr. Miksa and WSCC Administrators disfavored Dr. Eccles for promotion to Dean because of her gender and her complaints about gender-based disparate treatment and compensation.

41.     By installing the lesser qualified male candidate as Interim Dean, Dr. Miksa understood and intended that Dr. Matthew Smith would gain an advantage that would likely result in his selection as Dean because virtually all persons selected for an Interim Dean position at WSCC have been ultimately named as permanent Dean, and Dr. Miksa did not want a female to be Dean of Natural Science, regardless of her superior qualifications.

42.     In addition to the statistical evidence of historical sex discrimination by the defendants as alleged in Paragraph 20, the defendants have engaged in a pattern and practice of sex discrimination by placing male candidates into Interim Dean positions to give them advantages over female candidates. During Dr. Miksa's tenure as WSCC president, he has appointed a male faculty member as an Interim Academic Divisional Dean or Academic Divisional Dean *nine times out of nine*. Although many female faculty members held comparable or higher degrees and qualifications and have more experience than the male candidates specifically selected by

12

President Miksa, none have been chosen as either an Interim or a permanent Academic Divisional Dean. Each Interim Academic Divisional Dean selected by President Miksa has subsequently become the permanent Academic Divisional Dean or they are in process of doing so.

43. The 2019-2020 academic year began with Dr. Smith as Interim Dean of the Natural Science Division. In or around October 2019, the process for hiring a permanent Dean began. As that process was initiated, Vice President of Academic Affairs Donna Seagle, who had only just recently been hired into that position, met with the Natural Science Division to discuss the hiring process. That process would be managed by a selection committee, which would review and rank the candidates and select which candidates would advance to the interview stage. This committee would ultimately select one candidate to recommend for the Dean position. Dr. Seagle told the Division that the selection committee would mostly consist of tenured, senior faculty members with only two members from the Division. Tenured faculty have more experience, can better represent the historical needs of the college, and have more freedom to vote without bias of repercussions because tenure provides a degree of job protection.

44. While the formal selection process for Division Dean was being established throughout Fall 2019 and Spring 2020, Dr. Eccles continued to complain to WSCC Executive Director of Human Resources Jarvis Jennings about the discriminatory selection process for Interim Dean. One of her primary complaints that she addressed with Mr. Jennings was that it would be unfair and discriminatory to allow Dr. Smith's experience gained as Interim Dean to be considered in the final selection for Dean. Dr. Eccles was not the only faculty member who lodged complaints with Jennings about the interim selection process.

45. Although Jarvis Jennings acknowledged to Dr. Eccles as early as January 2020 that Dr. Smith had been given an advantage in the selection process for permanent Dean, he never

responded to Dr. Eccles or other faculty about their complaints and did nothing to investigate their concerns. Defendants took no steps to prevent the discriminatory interim selection process from infecting the final selection decision with Dr. Miksa's discriminatory intent to install a male as permanent Dean. In fact, the discriminatory interim selection had a determinative impact on the final selection.

46. In addition to allowing the selection process for permanent Dean to be infected with discriminatory animus from the interim selection, WSCC Administrators continued to manipulate the final selection process to disguise discrimination against Dr. Eccles. For example, once the hiring process began for Dean, the composition of the selection committee was changed from what Dr. Seagle had told the Division. While Dr. Seagle had said that the committee would consist of mostly tenured faculty members, it instead had only two tenured faculty members on it. Also, instead of having only two members from the Natural Science Division, the committee had four members from the Division. This change meant that fully half of the selection committee would be evaluating and ranking Dr. Smith, who as the Interim Dean was their current boss, someone who supervised them, provided them with access to extra funding, allowed course overloads for extra pay, approved promotion activities, created teaching schedules, and dispensed travel and other budgetary funds.

47. Likewise, in late October 2019, as one of the first steps in the hiring process for Dean, Dr. Smith was allowed to edit the job description and selection criteria to better fit his own qualifications, even though there was an existing job description for the permanent Dean position. This, of course, allowed Dr. Smith further advantage in the selection process.

48. Moreover, in October, Dr. Seagle had told the Division that other than the two (later four) Division selection committee members, the Natural Science Division would not participate

14

in the selection or interviewing of the candidates. This too was changed, seemingly at the last minute and unbeknownst to Dr. Eccles. Specifically, what had been announced as an Open Forum, a standard meet and greet of candidates, became an important round of interviews where all available faculty and staff from the Natural Science division were asked to rank the candidates on unknown and highly subjective criteria.

49.     Upon information and belief, the reason that this impromptu round of ranked interviews was added to the selection process was because the Selection Committee Chair voiced concerns about bias in the initial rankings of the candidates, which was supposed to be an objective assessment of the candidates' documented qualifications for the position using established selection criteria. Committee Chair David Atkins expressed concern that some members of the committee had exhibited bias because certain rankings simply could not be supported by the documented objective qualifications of the candidates. Likewise, the ranked interviews were added as an afterthought and to disguise discrimination because the initial ranking process clearly demonstrated that Dr. Smith indeed received an unfair advantage from the defendants' discriminatory placement of him into the Interim Dean position.

50.     Although the Open Forum was not advertised as an opportunity for Division faculty and staff to vote on selection of permanent Dean, unofficially behind the scenes, Dr. Smith's supporters and direct reports, including Kristin Rich who Dr. Smith appointed to be his Assistant Dean, lobbied on his behalf, and made "campaign" promises to encourage and pressure staff to "vote" for Dr. Smith over Dr. Eccles as permanent Dean. Kristin Rich ranked her boss "18" and Dr. Eccles "6" according to some unknown subjective criteria. Division staff were put in an untenable and inappropriate position to support their current boss, Dr. Smith, with no assurance of confidentiality if they did not vote for him, but various potential benefits if they did support him.

15

Dr. Smith's other assistant, Sherry Woody, who wrote a reference letter for him, ranked Dr. Eccles "3" and Dr. Smith "18" according to her subjective perspective of unknown criteria. Worse than a mere popularity contest, the selection process was manipulated to rubber stamp Dr. Miksa's long established discriminatory preference to pass over Dr. Eccles for promotion because of her gender, despite her superior qualifications, and to install his favored, yet lesser qualified, male candidate.

51.     On or about April 28, 2020, the Selection Committee Chair David Atkins scheduled Dr. Eccles for a final interview with Dr. Miksa and Dr. Seagle. In the past, the President has only interviewed the final candidate as a formality after selection.

52.     On May 1, 2020, Dr. Eccles was invited to a virtual meeting with Krystal Johnston, HR Specialist, at which time Ms. Johnston inform her that "Walters State has decided to go in another direction," and she was not chosen as the Dean of Natural Science. The method of communication was intended to further demean Dr. Eccles because the Administration had instructed an HR Specialist, not the HR Executive Director, the President, or a Vice President, but the person whom Mr. Jennings refers to as his "secretary" to notify Dr. Eccles of this important decision.

53.     Additional evidence that the defendants passed over Dr. Eccles for promotion based on her gender is demonstrated by her vastly superior qualifications for the Dean position compared to Dr. Smith. Dr. Eccles exceeds the selected male candidate in experience, seniority, awards, certifications, management qualifications, grants, tenure status, and virtually every category except those afforded to him by the discriminatory placement of him into the Interim Dean position. Dr. Eccles had already proven her character, professional integrity, teaching excellence, and superiority to WSCC and TBR in two different academic ranking systems. Dr. Smith is untenured and has not been promoted to full Professor. Dr. Eccles has over 23 years of higher education

experience compared to Dr. Smith who has less than 10 years' experience. The Natural Science Division delivers more than half of all course sections in an online format, which Dr. Eccles pioneered development of TN eCampus course offerings since 2007. Dr. Smith has never even taught online and has no experience to provide oversight or assistance to the faculty, students, and staff. Dr. Eccles has received the highest WSCC faculty award given, the WSCC Distinguished Faculty Member and been nominated for the highest TBR faculty award, the Faculty Excellence Award for the Statewide Outstanding Achievement and Recognition (SOAR). These are just a few examples of the comparative qualifications of the candidates, which may or may not have been considered by those who were given input at the last minute into the peculiar method for selecting a Dean.

54.     After being notified of the decision, Dr. Eccles promptly contacted Mr. Jennings and scheduled a meeting with him on May 4, 2020, at which time she reported her belief that WSCC had discriminated against her on the basis of gender when it passed over her for promotion to Dean of Natural Science Division. Dr. Eccles had a lengthy meeting with Mr. Jennings and discussed in detail the reasons that she believed the promotion decision was discriminatory.

55.     When she heard nothing further from Mr. Jennings, she contacted him again on May 19, 2020, by email with subject line "Sex discrimination complaint" to follow up and inquire about the status of the investigation that he indicated he would conduct.

56.     After two days with no response from Mr. Jennings, Dr. Eccles contacted Holly Girgies, Director of Human Resources for Tennessee Board of Regents, and requested assistance.

57.     Although Ms. Girgies assured Dr. Eccles that Mr. Jennings would contact her, when he did not do so by the end of the day on May 26, 2020, Dr. Eccles again contacted defendant TBR's HR Director to explain in more detail that she had been attempting to report and remedy

disparate treatment in WSCC's promotional process since at least November 22, 2019, including a follow-up two hour meeting with Mr. Jennings on January 21, 2020, and another two hour meeting with him on May 4th to discuss her sex discrimination complaint related to the final decision to pass over her for promotion to Dean. Dr. Eccles notified TBR that nothing has been done to address her complaints.

58.     On May 27, 2020, Mr. Jennings responded to Dr. Eccles by asserting that she had never complained to him about sex discrimination, despite documented evidence otherwise.

59.     On June 26, 2020, Dr. Eccles filed a complaint of sex discrimination with defendant TBR, but nothing has been done to remedy the discrimination.

60.     On July 8, 2020, Matthew Smith, new WSCC Dean of Natural Science, sent an email to Dr. Eccles notifying her that the schedule she had in place since March 4, 2020, was now being unexpectedly changed. Dr. Smith had suddenly decided to send Dr. Eccles to teach at a high school in a rural location far from WSCC and her home for the entire academic year. Dr. Eccles has never taught at or been asked to teach at a high school since being hired by the defendants in 2006. Such assignments are typically handled by adjunct faculty, and this undesirable reassignment was blatant retaliation for her protected activities.

61.     On July 10, 2020, Dr. Eccles emailed TBR Associate Vice Chancellor April Preston and TBR Human Resources Director Holly Girgies to report that WSCC Administrators were subjecting her to retaliation. Although Dr. Eccles had previously complained about discriminatory practices in pay, tenure, and promotion as early as 2015, her efforts to report and remedy the gender-based discrimination at WSCC increased in 2019 and 2020 with her opposition to discriminatory practices related to selecting the Dean of Natural Science.

62.     Even though Dr. Eccles reported retaliation to TBR and WSCC Administrators, the

retaliatory adverse actions continued. Examples of retaliatory adverse actions after Dr. Eccles complained about being passed over for promotion to Dean include but are not limited to: continuing threatened reassignments to less desirable positions, duties, and locations; threats of financial harm if she rejected the retaliatory reassignments; hostility directed toward her from Dean Smith; increased scrutiny of her by WSCC Administrators; misrepresentations made to her to try to disguise the retaliatory actions; withholding of awards and recognition that are normally provided to faculty; efforts to undermine her reputation; a degrading, unwarranted verbal attack in the presence of her students; and false reporting of her actions to campus security.

63.     Despite Dr. Eccles's complaints, neither WSCC nor TBR has taken any action to remedy the retaliation.

64.     The discriminatory and retaliatory treatment to which Dr. Eccles was subjected by the defendants was designed to and/or had the effect of altering the terms and conditions of her employment, interfering with her job performance, and discouraging her from remaining at her job.  Dr. Eccles perceived the environment as hostile or abusive and a reasonable person in her position would have likewise perceived it as hostile or abusive. Defendants' discriminatory and retaliatory harassment of Dr. Eccles was severe or pervasive and has created a hostile work environment for her.

65.     Defendants discriminated against Dr. Eccles on the basis of sex by paying her lower wages than they paid to male faculty for performing equal work.

66.     Defendants discriminated against Dr. Eccles on the basis of sex when they passed over Dr. Eccles for promotion to Dean of Natural Science.

67.     In retaliation for her protected activities, the defendants took materially adverse actions against Dr. Eccles that well might have dissuaded a reasonable worker from making or

supporting a charge of discrimination.

68. The reasons offered by the defendants to justify their harassment and adverse actions against Dr. Eccles are pretext to mask the true discriminatory and/or retaliatory motives.

69. As a direct result of the defendants' discriminatory and retaliatory employment practices, Dr. Eccles experienced harm, including humiliation, indignity, anxiety, emotional distress, damage to her reputation and future earning capacity, and substantial economic losses, including lost earnings, benefits, and expenses.

70. Defendants' actions against Dr. Eccles described herein were carried out willfully, intentionally, maliciously, and/or with reckless indifference to her rights under the law.

## VI. CAUSES OF ACTION

Count 1: Discriminatory Pay

71. Plaintiff Eccles re-alleges and incorporates paragraphs 11-70.

72. Defendants violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.*, and the Equal Pay Act, 29 U.S.C § 206(d)(1) when they discriminated against Dr. Eccles based on her sex by paying her lower wages than are paid to male employees for performing equal work.

73. Defendants' actions paying Dr. Eccles at a lower rate than similarly situated and comparable male employees in the same job because of her gender are willful.

74. In accordance with the Equal Pay Act and the Lily Ledbetter Fair Pay Act of 2009, as codified at 42 U.S.C. §2000e-5(e), plaintiff is entitled to recover damages for the three-year period preceding the filing of the lawsuit and two-year period preceding filing her EEOC Charge.

## Count 2: Discriminatory Failure to Promote

75.     Plaintiff Eccles re-alleges and incorporates paragraphs 11-70.

76.     Defendants violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.*, when they passed over Dr. Eccles for promotion to the Dean of Natural Science on the basis of her sex.

## Count 3: Retaliation

77.     Plaintiff Eccles re-alleges and incorporates paragraphs 11-70.

78.     Defendants violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-3(a) and the Equal Pay Act, 29 U.S.C § 206(d)(1), when they took adverse actions against Dr. Eccles that would dissuade a reasonable employee from reporting or complaining about unlawful discrimination.   Defendants retaliated or condoned retaliation against Dr. Eccles because she opposed unlawful employment practices and/or participated in an investigation or proceeding into such practices made unlawful by Title VII and/or the EPA.

## Count 4: Hostile Work Environment

79.     Plaintiff Eccles re-alleges and incorporates paragraphs 11-70.

80.     Defendants violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.*, when they engaged in or condoned discriminatory and retaliatory harassment of Dr. Eccles that was sufficiently severe or pervasive to create a hostile work environment for her.

## VII. PRAYER FOR RELIEF

Plaintiff Eccles requests that the Court grant her the following relief:

a) Enter judgment for plaintiff and against defendants; declare that the actions of defendants violate the Equal Pay Act and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2(a) and §2000e-3(a) and enjoin defendants from further unlawful discriminatory and retaliatory practices.

b) Order defendants to promote plaintiff or, in the alternative, to award her front pay.

c) Order defendants to pay plaintiff back pay, benefits, increments, and financial adjustments to which she is entitled.

d) Award plaintiff compensatory damages for mental and emotional distress in an amount to be determined by a jury.

e) Award plaintiff liquidated damages in an amount equal to her lost back pay.

f) Award plaintiff reasonable attorneys' fees and the costs of this cause.

g) Award plaintiff interest and any further relief this Court deems just, proper, and equitable.

h) plaintiff requests a jury trial in this cause.

DR. LISA ECCLES

By her attorneys:

s/ *Jennifer B. Morton*
Jennifer B. Morton, BPR #015585
**JENNIFER MORTON LAW, PLLC**
8217 Pickens Gap Road
Knoxville, TN 37920
(865) 579-0708
(865) 579-0787 (fax)
jen@jmortonlaw.com


Wade B. Cowan, BPR #09403
P.O. Box 50617
Nashville, Tennessee 37205-0617
(615) 352-2331
wcowan@dhhrplc.com

22